IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DISTRICT

JOHN WILLIAM ARMSTRONG                                                                PLAINTIFF

v.                                      1:13CV00115-JLH-JJV

CAROLYN W. COLVIN,
Acting Commissioner,
Social Security Administration                                                         DEFENDANT

## RECOMMENDED DISPOSITION

### Instructions

The following recommended disposition was prepared for U.S. District Judge J. Leon Holmes. A party to this dispute may object to this recommendation in writing. An objection must be specific and state the factual and/or legal basis for the objection. An objection to a factual finding must identify the finding and the evidence supporting the objection. Objections must be filed with the Clerk of the Court no later than 14 days from the date of this recommendation.[1] The objecting party must serve the opposing party with a copy of an objection. Failing to object within 14 days waives the right to appeal questions of fact.[2] If no objections are filed, Judge Holmes may adopt the recommended disposition without independently reviewing the record evidence. An objecting party who seeks to submit new, different, or additional evidence, or to obtain a hearing for that purpose, must address the following matters as part of written objections: (1) why the record before the magistrate judge was inadequate, (2) why the evidence was not presented to the magistrate judge, and (3) details and/or copies of any testimony and/or documents to be proffered at a hearing. Based

---

[1] 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

[2] *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (failure to file objections waives right to de novo review and to appeal magistrate judge's findings of fact).

on this submission, Judge Holmes will determine the need for a hearing.

## Recommended Disposition

John William Armstrong seeks judicial review of the denial of his application for disability benefits.[3] The application flowed from injuries sustained in a motor vehicle accident, after Mr. Armstrong fell asleep returning home from work.[4] His vehicle left the road and struck a tree.[5] Mr. Armstrong sustained severe facial injuries. His vision is now impaired.

**The Commissioner's decision**. After considering the application, the Administrative Law Judge (ALJ) determined Mr. Armstrong has severe impairments — loss of peripheral vision, post traumatic stress disorder (PTSD), adjustment disorder with depressed mood, and borderline intellectual functioning[6] — but he can do some unskilled work.[7] Because a vocational expert identified work within defined parameters,[8] the ALJ determined that Mr. Armstrong is not disabled and denied the application.[9]

After the Appeals Council denied a request for review, the ALJ's decision became a final

---

[3] SSA record at pp. 109 & 116.

[4] *Id*. at p. 135 (basing disability on head trauma, vision problems, and headaches).

[5] *Id*. at p. 32 (testifying about how the accident occurred).

[6] *Id*. at p. 10.

[7] *Id*. at p. 13 (excluding work requiring excellent vision, peripheral vision, or reading print smaller, and requiring unskilled simple, repetitive tasks free of fast pace production requirements, where supervision is simple, direct, and concrete).

[8] *Id*. at p. 50 (identifying hospital cleaner, cleaner/housekeeping, and clerical office helper as available work).

[9] *Id*. at p. 20.

decision for judicial review.[10]  Mr. Armstrong filed this case to challenge the decision.[11]  In reviewing the decision, the Court must determine whether substantial evidence supports the decision and whether the ALJ made a legal error.[12]  This recommendation explains why substantial evidence does not support the decision and why the case should be remanded.

**Mr. Armstrong's allegations**.  Mr. Armstrong challenges all aspects of the ALJ's decision.  Most of his arguments are based on the limitations immediately following the accident, but his more persuasive arguments are based on the residual effects of his injuries.  Mr. Armstrong contends impaired vision and frequent headaches prevent him from working, balance issues and dizziness interfere with walking, and traumatic brain injury causes confusion and memory loss.  He contends the ALJ failed to consider the combination of his symptoms.  He argues that the ALJ failed to fully and fairly develop the evidence as to mental retardation.  For these reasons, he maintains substantial evidence does not support the ALJ's decision.[13]

**Applicable legal principles**.  For substantial evidence to support the decision, a reasonable mind must accept the evidence as adequate to support the ALJ's determination about Mr.

---

[10]*See Anderson v. Sullivan*, 959 F.2d 690, 692 (8th Cir. 1992) (stating, "the Social Security Act precludes general federal subject matter jurisdiction until administrative remedies have been exhausted" and explaining that the Commissioner's appeal procedure permits claimants to appeal only final decisions).

[11]Docket entry # 1.

[12]*See* 42 U.S.C. § 405(g) (requiring the district court to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner conformed with applicable regulations); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny an applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled.").

[13]Docket entry # 14.

Armstrong's ability to work.[14] The ALJ determined that Mr. Armstrong can work at all exertional levels with the following limitations: (1) work that does not require excellent vision, peripheral vision, or reading print smaller than newspaper print; and (2) unskilled, simple, repetitive tasks, without fast pace production requirements, and requiring simple, direct, concrete supervision. The first set of limitations (the vision limitations) responds to impaired vision; the second set (the mental limitations)— responds to intellectual functioning. The question before the Court is whether a reasonable mind would accept the evidence as adequate to show Mr. Armstrong can work with these limitations.

**Whether substantial evidence exists**. In determining a claimant's ability to work, the ALJ must "establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of [his] impairments."[15] A reasonable mind would not accept the evidence in this case as adequate to support the ALJ's determination because the determination does not consider all of Mr. Armstrong's impairments; specifically, the residual effects of traumatic brain injury.

**Traumatic brain injury**. "Traumatic brain injury…is a physical injury to brain tissue that temporarily or permanently impairs brain function."[16] In addition to multiple facial fractures, Mr. Armstrong sustained traumatic brain injury when he crashed into the tree: a subdural hematoma, an intraparenchymal hematoma, a pneumocephalus, and a hemorrhage in the right suprasellar cistern.[17]

---

[14] *Slusser v. Astrue*, 557 F.3d 923, 925 (8th Cir. 2009); *Britton v. Sullivan*, 908 F.2d 328, 330 (8th Cir. 1990).

[15] *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

[16] Rebecca J. Frey, 2 The Gale Encyclopedia of Mental Health 1594 (3d ed.).

[17] SSA record at p. 303 (discharge summary) & p. 312 (diagnostic imaging).

4

Mr. Armstrong was so severely injured that he was unable to breathe on his own.[18] The brain injury prevented surgeons from repairing the fractures.[19]

After being on a ventilator for six days, surgeons performed a tracheostomy and removed the ventilator.[20] Two days later, after the brain injuries stabilized, surgeons repaired the facial fractures using metal hardware.[21] Mr. Armstrong remained hospitalized for seven more days. Two months after the injuries, diagnostic imaging showed no hematoma or hemorrhage.[22]

After brain injury resolves, residual effects can linger for weeks or months; in severe cases, the effects may be permanent.[23] Symptoms include headache, dizziness, double vision, difficulty with coordination and balance, mental confusion, behavior changes, memory loss, cognitive deficits, depression, stuttering, and emotional outbursts.[24] Mr. Armstrong complains about these symptoms.

---

[18]*Id.* at p. 301 (stating that patient cannot be weaned off ventilator).

[19]*Id.* at p. 298 (initial evaluation by otolaryngologist: "We will have to wait until this patient is cleared by neurosurgery.") & p. 300 (stating that patient was monitored for several days for cerebrospinal fluid leak before clearing for surgery).

[20]*Id.* at p. 301 (operative report).

[21]*Id.* at p. 305 (operative report).

[22]*Id.* at p. 296.

[23]*See* Loring F. Chapman, 1 Courtroom Med. - Head & Brain § 31.70-13.71 (neurological sequelae to traumatic brain injury may last from months to many years); Barbara J. Mitchell & Laura Jean Cataldo, 4 The Gale Encyclopedia of Med. 2790 (4th ed.) (symptoms of traumatic brain injury may linger for weeks or months, and in severe cases, may be permanent).

[24]*See* Barbara J. Mitchell & Laura Jean Cataldo, 4 The Gale Encyclopedia of Med. 2790 (4th ed.) ("Symptoms of traumatic brain injury include problems with thinking, memory, and judgment as well as mood swings, and difficulty with coordination and balance. … Double vision for months after an injury is not uncommon."); Rodney Gabel & Rebecca J. Frey, 5 The Gale Encyclopedia of Med. 4184 (4th ed.) ("Neurogenic stuttering results from brain damage, such as…a traumatic injury to the brain…."); Carol A. Turkington, Teresa G. Odle & Laura Jean Cataldo, 3 The Gale Encyclopedia of Med. 1976-77 (4th ed.) (listing symptoms of post-concussion syndrome: headache, dizziness, mental confusion, behavior changes, memory loss, cognitive deficits, depression, and emotional outbursts); Loring F. Chapman, 2 Courtroom Med. - Head & Brain § 45.50 (explaining

Despite the severity of Mr. Armstrong's injuries and his numerous complaints, the ALJ focused on vision loss and intellectual functioning. Both impairments flow from traumatic brain injury.

**Impaired vision**. Mr. Armstrong had no vision problems before the accident,[25] but after the accident, he lacked peripheral vision and he saw double;[26] that is, his eyes were no longer aligned to work together and he saw two images. The ALJ included vision limits in determining Mr. Armstrong's ability to work, but those limits do not respond to the full extent of Mr. Armstrong's impairments.

The vision limits do not respond to the loss of spacial orientation. Peripheral vision is used for general spacial orientation, and thus the loss of peripheral vision compromises a person's sense of balance and movement.[27] The loss of peripheral vision supports Mr. Armstrong's complaint about problems with balance and walking. Double vision also affects a person's spatial awareness, because a person sees two images, and therefore, disrupts a person's ability to read, walk, and drive.[28]

---

that physical symptoms following traumatic brain injury may include headaches, dizziness, visual problems, dysarthria, sensory-motor speech difficulty, abnormal hearing acuteness due to irritability of sensory-neural input, and difficulties in limb use; cognitive problems include memory, moodiness, and emotional changeability).

[25] SSA record at p. 225 (preemployment physical shortly before accident, no vision problems, no reading difficulties).

[26] *Id*. at p. 237 (first post-discharge ophthalmology examination, diagnoses: no peripheral vision and double vision).

[27] *See* Steve Gallop, *Peripheral Visual Awareness: The Central Issue*, 7 J. of Behavioral Optometry 151-55 (1996).

[28] Allen H. Cohen, *Visual Problems Associated with Acquired Neurological Events*, (Aug. 29, 2014 11:20 AM), http://www.braininjuries.org/brain_injury_double_vision.html ("Persons who have suffered a neurological event often have visual processing problems and functional vision problems that are not adequately managed. These problems cause extreme difficulty, not only with balance and movement, but also could affect the person's perception of space and their ability to process this information.").

Mr. Armstrong was initially treated with eye glasses with ophthalmic prisms,[29] and later treated with eye muscle surgery to align the eyes.[30] His vision improved over time, but double vision persisted.[31] Mr. Armstrong testified that he still sees double and lacks peripheral vision. Medical evidence supports his testimony.

In considering the impact of impaired vision, the ALJ was influenced by observation — Mr. Armstrong entered the hearing room unescorted. Mr. Armstrong may no longer need a guide to walk, but seeing double — if only intermittently — and lacking peripheral vision implicate more impairment than the vision limitations anticipate because both defects affect balance and coordination. Problems with balance and coordination implicate work hazards where a loss of balance or coordination pose the risk of injury, but the ALJ included no environmental limitations.

**Intellectual functioning**. Like the vision limitations, the mental limitations do not address the full extent of Mr. Armstrong's impairment. Mr. Armstrong testified that he can't remember where he is, he gets lost in his own home, he now stutters, he can't enjoy his children because of agitation, he loses his words when he speaks, and he has nightmares and headaches.[32] The ALJ implicitly rejected the testimony as incredible. Ordinarily, an ALJ's credibility evaluation receives much deference,[33] but such deference isn't due in this case for two reasons: (1) The ALJ did not

---

[29]SSA record at pp. 33, 431-32, 434, 502-04 & 506.

[30]*Id*. at pp. 33 & 512.

[31]*Id*. at p. 515 (two months after eye muscle surgery, double vision improved but persisted).

[32]*Id*. at pp. 31-32, 34, 38 & 40.

[33]*Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (explaining that reviewing court "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."); *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (stating, "what evidence to believe and what weight to give it is the prerogative of the fact-finder, within broad limits").

consider the residuals of traumatic brain injury, and (2) the ALJ focused on Mr. Armstrong's initial allegations — i.e., his symptoms during early recovery — rather than the residual effects of his injuries.

Failing to consider the residuals of traumatic brain injury undermines the ALJ's mental limitations. The mental limitations respond to borderline intellectual functioning, but the medical evidence indicates greater impairment. Seven months after the accident, Mr. Armstrong sought mental health treatment to deal with the results of his accident.[34] He complained about short term memory loss, nightmares, irritability, anger outbursts, stuttering, sexual dysfunction, depression, and vision loss.[35] A few months later, he was examined by the psychological examiner.[36] His complaints were the same.

During the evaluation, he complained about short term memory loss, dizziness, confusion, getting lost in his home, nightmares about the accident, depression, and social isolation.[37] These symptoms underlie the examiner's diagnosis of PTSD and adjustment disorder with depressed mood.[38]

The examiner also diagnosed borderline intellectual functioning.[39] Mr. Armstrong's IQ scores fell within the range of mental retardation, but the psychological examiner estimated that Mr.

---

[34] SSA record at p. 452 (initial visit). *See also id*. at p. 380 (complaining to primary care physician five weeks earlier about anxiety and temper; he can't even hold his child).

[35] *Id*. at pp. 451-58.

[36] *Id*. at p. 460.

[37] *Id*. at pp. 460-67.

[38] *Id*. at p. 466.

[39] *Id*.

Armstrong's intellectual functioning is higher than his scores indicate.[40] According to the examiner, Mr. Armstrong's performance on basic cognitive tasks is consistent with borderline intellectual functioning. Although there's no serious argument for mental retardation — due to adaptive skill and work history[41] — Mr. Armstrong's performance on basic cognitive tasks implicates traumatic brain injury. The ALJ should have considered the scores as a residual of traumatic brain injury rather than out-right rejecting the scores as invalid.

According to the psychological examiner, "It would be helpful to review records or discharge summaries from surgeons or neurologists associated with [Mr. Armstrong's] medical treatment following his wreck."[42] Had the examiner reviewed the treatment records, the diagnoses may have been different, because the reported symptoms are consistent with traumatic brain injury. Notably, the DSM-V — published after the evaluation — added traumatic brain injury as a subclassification of neurocognitive disorders. Without treatment records, the examiner could not accurately assess whether Mr. Armstrong's cognitive impairment and slow responses flowed from innate intellectual functioning, traumatic brain injury, or malingering.

**Credibility evaluation**. The ALJ's credibility evaluation reflects the consequence of not recognizing traumatic brain injury. The recent medical evidence indicates Mr. Armstrong had double vision and experienced headaches. He was referred to a neurologist for headaches,[43] but he hadn't seen a neurologist. His reason doesn't make much sense,[44] but the referral nevertheless

---

[40]*Id*. at pp. 465-66.

[41]*Id*. at pp. 122, 136, 141 & 168.

[42]*Id*. at p. 467.

[43]*Id*. at p. 514.

[44]*Id*. at p. 34-35 (testifying that every neurologist turned him down because he was in a motor vehicle accident).

supports the allegation of headaches. Mr. Armstrong reported regular mental health treatment,[45] but the record doesn't include associated treatment records. Those treatment records and a neurological examination would provide a better basis for evaluating credibility. Although the claimant carries the burden of presenting medical evidence to support his claim, a claimant who suffers traumatic brain injury may be unable to present his best case. The determination about Mr. Armstrong's ability to work would have been different if the ALJ had considered traumatic brain injury.

### Recommended Disposition

Viewed as a whole, the record supports Mr. Armstrong's testimony about his symptoms. A reasonable mind would not accept the evidence as adequate to support the ALJ's decision because the decision does not address traumatic brain injury. For this reason, the undersigned magistrate judge recommends REVERSING the decision and REMANDING the case to the Commissioner with the following instructions:

> On remand, the ALJ shall obtain: (1) updated medical evidence to include ophthalmology records, primary care physician records, mental health records, and school records, if available; (2) a mental diagnostic evaluation and IQ testing by an examiner who has reviewed treatment records associated with traumatic brain injury; and (3) a neurological examination by a neurologist who has reviewed treatment records associated with traumatic brain injury. After obtaining that evidence, the ALJ will consider the evidence as a whole, to include evidence of traumatic brain injury, and determine Mr. Armstrong's ability to work.

This is a "Sentence Four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 4th day of September, 2014.

_____
JOE VOLPE
UNITED STATES MAGISTRATE JUDGE

---

[45]*Id*. at pp. 460-61.